Docket No. 41

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

ANTOINETTE FUSSELL,

      Plaintiff,

      v.

COSTCO WHOLESALE
CORPORATION, ROB GREGER, and
JOHN DOES 1-5 and 6-10,

      Defendants.

Civil No. 24-6614-RMB-AMD

**OPINION**

**RENÉE MARIE BUMB, Chief United States District Judge**:

      **THIS MATTER** comes before the Court upon a Motion for Summary Judgment (the "Motion") filed by Defendants Costco Wholesale Corporation ("Costco") and Rob Greger ("Greger") (collectively, "Defendants").  [Docket No. 41.]  Having considered the parties' submissions, the Court resolves the Motion without oral argument.  FED. R. CIV. P. 78(b); D.N.J. LOC. CIV. R. 78.1(b).  For the reasons below, Defendants' Motion is **GRANTED IN PART** and **DENIED IN PART**.  The Court intends to **SCHEDULE** this matter for **TRIAL** upon submission of the Final Pre-Trial Order.

### I.    FACTUAL BACKGROUND

      In the winter of 2015 Costco hired Plaintiff Antoinette Fussell ("Plaintiff") as a seasonal employee in the Major Sales department of its Mount Laurel, New Jersey, warehouse (the "Warehouse").  [Docket No. 41-35 ¶ 1 ("Defs.' SOMF").]  Plaintiff assumed a full-time role as an assistant cashier in June 2019 and then as a cashier in September 2020.  [*Id.* ¶ 5.]  In that role, Plaintiff relocated to "the front the Warehouse where customer service

and checkout registers are located," and which required her to provide, among other duties, "prompt and courteous member service." [Defs.' SOMF ¶ 6; Docket No. 44-1 ¶ 6 ("Pl.'s Opp. SOMF").] Since April 2022, Plaintiff adhered to the following chain of command: She reported to Front End Supervisor Rachael Peralta, who reported to Assistant Front End Manager Veronica Forsythe, who reported to Front End Manager Andrew Macaluso. [Defs.' SOMF ¶¶ 9–12.] Macaluso, in turn, reported to one of the three Assistant General Managers, who reported to General Manager Greger, who, finally, reported to Costco's Regional Vice President Tony Ewing. [*Id.* ¶¶ 7–8, 13.]

During Plaintiff's employment, Costco "maintained an Employee Agreement that contained various policies and procedures related to Plaintiff's employment, including its policies prohibiting against discrimination, harassment and retaliation." [*Id.* ¶ 16.] The Employee Agreement relevantly "contains an 'Open Door Policy' which encourages employees to raise issues, whether verbally or in writing, with various levels of management as they see fit." [*Id.* ¶ 17.] The Open Door Policy additionally states "that employees will receive a prompt response." [*Id.* ¶ 18; Pl.'s Opp. SOMF ¶ 18.]

Costco's Employee Agreement "also contained an Equal Opportunity Policy, which prohibited discrimination and unlawful harassment in the workplace," as well as "an Anti-Harassment Policy that further outlines Costco's prohibition of all forms of unlawful harassment in the workplace." [Defs.' SOMF ¶¶ 19–20.] In a section titled "Reporting Harassment, Discrimination, or Retaliation," the Employment Agreement further "encouraged employees to report any claims of discrimination, harassment discrimination to any manager, in accordance with the Open Door Policy, or through Costco's Ethicspoint site." [*Id.* ¶ 21.] Each time Costco updated the Employee Agreement, Plaintiff "signed to

2

acknowledge receipt" of it, received "a physical copy of the new version," and management "communicate[d] the changes."  [*Id.* ¶¶ 22–23.]  Costco also "keep[s] extra copies for employees' reference" and "[e]mployees are permitted to ask questions about the updated Employee Agreement to the manager delivering the information, to any manager at the warehouse, or to Human Resources."  [*Id.* ¶¶ 24–25.]

Plaintiff "was aware of these policies during her employment with Costco."  [*Id.* ¶ 27.] She, "along with her non-manager and manager coworkers, received annual training on Costco's policies prohibiting discrimination, harassment and retaliation as well as the Open Door Policy during Costco's HR Month."  [*Id.* ¶ 28.]  "During HR Month, employees are trained in-person and provided with a full copy of Costco's employment policies, their specific contacts under the Open Door Policy," while General Managers and Assistant General Managers are trained "on how to conduct an investigation into claims of discrimination, harassment, and retaliation."  [*Id.* ¶¶ 29–30; Pl.'s Opp. SOMF ¶ 30.]

The Employee Agreement "also contained policies that detailed grounds for employee discipline and termination."  [Defs.' SOMF ¶ 31.]  "Relevant to this case, the … Employee Agreement listed several 'Causes for Termination', among them: '10. Serious misconduct of any kind as defined by the Company, including, but not limited to, failure to provide fair, courteous, or respectful member service.'"  [*Id.* ¶ 32.]  The Employee Agreement additionally "contained a list of 'Causes for Disciplinary Action' which included: '6. Failure to interact with others in a respectful, courteous, and professional manner.'"  [*Id.* ¶ 33.]  One of the objectives set forth in the Employee Agreement "is to take care of our members," or customers.  [*Id.* ¶ 34 & n.2 (alteration in original).]  In service thereof, Costco expects employees "who are dealing with a difficult member to walk away or get a supervisor or

3

manager involved." [*Id.* ¶ 35 (quotation mark omitted).] The parties variably agree that Plaintiff received discipline prior to her termination for rude interactions with members.[1] [*Id.* ¶¶ 36–51.]

Against this backdrop, the animating dispute is Plaintiff's relationship and interactions with Peralta, her supervisor, from August 2022 to May 2023. According to Defendants, Peralta and Plaintiff simply "struggled to communicate properly during work." [*Id.* ¶ 53.] Indeed, Plaintiff testified that "most of [her] conflicts … with [Peralta] were about whose direction [she] needed to follow," Peralta's or that of another supervisor. [Docket No. 41-1, Ex. B, at 145:10–13 ("Defs.' Br.").] Plaintiff further testified that Peralta "would always just keep singling me out … every time [she got] direction from another supervisor." [*Id.* at 122:1–3.] This resulted in Peralta "pull[ing]" Plaintiff "into the office about insubordination" "at least like twice a week." [*Id.* at 123:23–25.] And, on December, 8, 2022, "Peralta provided a written coaching to Plaintiff alleging she failed to listen to Peralta's directive." [Docket No. 44-1 ¶ 9 (Pl.'s SOMF").] For her part, Peralta testified that Plaintiff "was difficult at times," particularly "[w]ith any directive [she] would try to give," although Peralta qualified that Plaintiff was not the only employee who posed such difficulties. [Defs.' Br., Ex. E, at 58:7–59:2.]

Plaintiff suspects an additional layer to Peralta's conduct, arguing that these actions must be construed in light of Peralta "pr[ying] into [her] romantic relationship on two occasions." [Pl.'s SOMF ¶ 6.] The parties agree that Peralta, a heterosexual woman married to her husband for fifteen years, "never touched Plaintiff inappropriately," "tried to hug or

---

[1] Although the parties agree on this, they have a difference of opinion on the extent and severity of Plaintiff's disciplinary background. *See* [Defs.' SOMF ¶¶ 36–51; Pl.'s Opp. SOMF ¶¶ 36–51.]

kiss Plaintiff," "asked Plaintiff to socialize outside of work," or "communicated with Plaintiff outside of work." [Defs.' SOMF ¶¶ 78, 81.]  According to Plaintiff's deposition testimony, though, in August 2022, Peralta asked her, "[W]hy did you break up, or why are you – are you single, or why, and just certain questions of that nature." [*Id.* ¶ 83.]  "When Plaintiff asked Peralta not to do that, Peralta stopped," but Plaintiff further testified that Peralta "wanted to try to tell [her] something about her and her husband." [*Id.* ¶¶ 86, 89; Defs.' Br., Ex. B, at 118:6.]  Plaintiff responded, "Don't do that neither [sic]," to which Peralta ceased again. [Defs.' SOMF ¶ 89; Defs.' Br., Ex. B, at 118:7–8.]

Plaintiff testified that she reported Peralta "prying a little bit into my personal life" to Forsyth and that she "didn't like that." [Defs.' Br., Ex. B, at 112:12–14; Defs.' SOMF ¶ 82.] Plaintiff also "complained to Forsythe that she felt singled out by Peralta and that Peralta was 'harassing her.'" [Defs.' SOMF ¶ 62.]  Plaintiff believed then that they had "nipped that in the bud" because "it kind of stopped a little bit." [Defs.' Br., Ex. B., at 112:22–13:2; Defs.' SOMF ¶ 90.]  But, as the parties agree, on January 28, 2023, "Plaintiff decided to go to the office with Peralta to discuss the ongoing issues with the Assistant General Manager and requested to have a sit-down meeting with … Macaluso and … Forsythe." [Pl.'s SOMF ¶ 16.] "However, that requested sit-down … did not take place." [*Id.* ¶ 17.]  Apart from this episode, the parties agree that Plaintiff "utilized Costco's Open Door Policy to raise her issues with Peralta." [Defs.' SOMF ¶ 70; Pl.'s Opp. SOMF ¶ 70.]  The parties dispute, however, whether Plaintiff discussed Peralta's conduct with General Manager Greger "multiple times as well" up to this point. [Pl.'s SOMF ¶ 19; Defs.' Opp. SOMF ¶ 19.]

Following these efforts, Plaintiff testified that Peralta again probed into her romantic past in May 2023, asking, "Well, why did you all break up." [Defs.' SOMF ¶ 88.]  Peralta

stopped again at Plaintiff's insistence.  [*Id.* ¶ 88.]  Peralta denies making either of the two inquiries.  [*Id.* ¶ 85.]  Then, in May 2023, Plaintiff met with Peralta, Greger, and Forsyth.  [Pl.'s Opp. SOMF ¶ 20.]  Plaintiff testified that she complained about Peralta "singling her out," at which point "Greger and Forsythe … requested th[at] Plaintiff step out so they could have a conversation with Peralta."  [*Id.* ¶¶ 21–22.]  Upon her return, Plaintiff avers that "Greger informed [her] that Peralta had a 'crush' on her," to which Peralta "agreed."  [Pl.'s Opp. SOMF. ¶ 23; Defs.' SOMF ¶ 75.]  Plaintiff, "underst[anding] that Peralta's conduct was thus because Plaintiff did not respond to her in a manner that Peralta wanted her to," responded that, "[W]e can work together, but I don't feel the same way."  [Pl.'s SOMF. ¶ 24; Defs.' SOMF ¶ 75.]  Greger, Forsythe and Peralta, however, "all deny that anyone told Plaintiff [that] Peralta had a crush [on] her."  [Defs.' SOMF ¶ 76.]  And Peralta denies having had a romantic interest in Plaintiff.  [*Id.* ¶ 77.]  Following the meeting, on June 3, 2023, "Peralta wrote an email to" Administrative Manager Johanna Scavelli "again claiming Plaintiff ignored her direction."  [Pl.'s SOMF ¶ 26.]  In her deposition, Plaintiff disputed "that this occurred."  [*Id.* ¶ 27.]

Three weeks later June 24, 2023, a member and his family approached a self-checkout register near Plaintiff.  [*Id.* ¶ 94.]  The member's Costco membership card had someone else's picture on it, so Plaintiff believed she needed to send the member to the "podium" so his membership could be verified.  [*Id.* ¶ 95.]  The member did not listen to Plaintiff's instruction and continued towards the self-checkout register to ring up his items.  [*Id.* ¶ 96.]  Plaintiff followed the member to the register and physically blocked him from continuing to check out.  [*Id.* ¶ 97.]  When Plaintiff attempted to explain that the member needed to have his membership card verified, the member asked for further explanation, which led to he and

Plaintiff "overtalking each other." [*Id.* ¶ 98.] A manager "had to physically separate Plaintiff from the member." [*Id.* ¶ 99.] Plaintiff testified that the manager "blocked [her] and pushed her away from the member." [Pl.'s Opp. SOMF ¶ 99.] Plaintiff, though, "concedes this was not an appropriate way to interact with a member," "knows she should have walked away," and "takes full responsibility for" the incident. [Defs.' SOMF ¶¶ 101–03; Pl.'s Opp. SOMF ¶¶ 101–02.]

On June 27, 2023, Assistant General Manager Scott Conklin emailed Samuel Blythe from Costco's Human Resources Department "seeking guidance on whether the June 24, 2023[,] incident warranted the termination of Plaintiff's employment." [Defs.' SOMF ¶ 106.] Conklin stated that "Plaintiff would be suspended," but asked whether "'this incident is terminable' based on prior ECNs issued to Plaintiff for member incidents." [*Id.* ¶ 107.] Blythe replied, "I do think based on the extreme behavior shown, we can support termination with the proper approvals." [*Id.* ¶ 108.] The next day Plaintiff received "an ECN for this incident" and Greger, with Ewing's approval, "made the decision to suspend Plaintiff."[2] [*Id.* ¶¶ 109–10.] Greger then "recommended Plaintiff be terminated to Ewing on July 5, 2023." [Pl.'s SOMF ¶ 39.]

On July 11, 2023, Yoram Rubanenko, Costco's Executive Vice President, Chief Operating Officer – Eastern Division, received Greger's recommendation that Costco terminate Plaintiff's employment for the June 24, 2023, incident. [Defs.' SOMF ¶¶ 115–16.]

---

[2] Over these same two days, the parties spar over several incidents. First, Plaintiff testified that Peralta called her into her office and accused her of insubordination on June 27, 2023, the underlying substance of which Plaintiff disputes. [Pl.'s SOMF ¶¶ 28–29.] The parties also dispute whether Peralta or Steve Baker, a Manager, drafted the ECN that resulted from this. [*Id.* ¶ 30; Defs.' Opp. SOMF ¶ 30.] A disagreement also arises over whether Plaintiff spoke with Conklin and Pereira about Peralta's alleged harassment on Plaintiff's final day, June 28, 2023. *See* [Pl.'s SOMF ¶¶ 34–35; Defs.' Opp. SOMF ¶¶ 34–35; Defs.' Br., Ex. Z.]

Rubanenko, who "was not aware of any complaints or allegations Plaintiff may have raised concerning sexual harassment," "reviewed Greger's recommendation and approved of the decision to terminate." [*Id.* ¶¶ 117–18.] Costco officially terminated Plaintiff's employment on July 13, 2023, with which the parties agree that Peralta "had no involvement in Plaintiff's suspension or termination of employment." [*Id.* ¶¶ 119, 121.] Originally, Plaintiff's termination form listed "Excessive Policy Violations" as the stated reason for her termination. [Defs.' SOMF ¶ 120; Pl.'s Opp. SOMF ¶ 120.] Defendants claim this was a mistake. [Defs.' SOMF ¶ 120.]

On August 12, 2023, Plaintiff emailed Ewing to "get a little more clarity on [her] termination." [*Id.* ¶ 122.] In her email, Plaintiff wrote that she spoke to Conklin and Pereira "about … [Peralta] … who ke[pt] harassing me and the[y] d[id] nothing about it." [Defs.' Br., Ex. Z.] Plaintiff found it "very odd" that she complained about Peralta on June 28, 2023, and that management "[brought] up an incident from almost a month ago." [Defs.' SOMF ¶ 124.] Plaintiff subsequently clarified that her reference to "an incident from almost a month ago" was her recalling the June 24, 2023 incident, or four days prior to her suspension. [*Id.* ¶ 126.]

On August 14, 2023, Plaintiff and Ewing spoke about the June 24, 2023, incident and the days surrounding it. [*Id.* ¶ 127.] Ewing promised to look into the concerns about Peralta's harassment. [*Id.* ¶ 128.] Partnering with Jonathan Shue, a Personnel Specialist "whose job included … supporting warehouse management on questions concerning Costco's policies and procedures, internal investigations, and employee discipline," Ewing "investigate[d] Plaintiff's concerns regarding her termination of employment, given that Plaintiff raised an issue of Peralta harassing her, of which Ewing was not previously aware." [*Id.* ¶¶ 15, 131.]

Shue, wanting to understand Plaintiff's accusation of Peralta's alleged harassment, spoke with Plaintiff by telephone on September 1, 2023.  [*Id.* ¶¶ 132–33.]  The phone report of that call shows that Plaintiff, although not explicitly accusing Peralta of *sexual* harassment, reiterated that Peralta "antagonized" her for the reasons discussed above: pulling her into the office, conflicting supervisor directions, accusations of insubordination.  [Defs.' Br., Ex. CC, at 2.]

Shue then "requested and reviewed all documentation related to Plaintiff's termination," with he and Ewing concluding that "Plaintiff's employment was "appropriately terminated because of the June 24, 2023[,] member incident."  [Defs.' SOMF ¶¶ 139–40.] Shue and Ewing "explained that the reason for her termination should have been labeled 'Serious Misconduct' as opposed to 'Excessive Policy Violations.'"  [*Id.* ¶¶ 140, 143.]  This was so because, according to the Employment Agreement, Plaintiff had accrued three ECNs, but not within a six-month period to qualify as "Excessive Policy Violations."  [*Id.* ¶¶ 141–42.]  Shue and Ewing reported the outcome of their investigation to Plaintiff on September 28, 2023, and provided her a second termination notice.[3]  [*Id.* ¶¶ 139, 144.]

The parties lastly dispute whether Costco similarly disciplined other employees for member incidents at the Warehouse, the main fracas being whether the "failure to provide fair, courteous, or respectful member service" can constitute a terminable or non-terminable violation under the Employe Agreement.  *See* [*Id.* ¶¶ 147–58; Pl.'s Opp. SOMF ¶¶ 147–58; Pl.'s SOMF ¶¶ 45–81; Defs.' Opp. SOMF ¶¶ 45–81.]

---

[3] Plaintiff has produced a third termination notice but, beyond different signature dates from Costco management, it mirrors the second's stated reason of "Serious Misconduct."  *See* [Pl.'s Opp. SOMF ¶ 144; Docket No. 44, Exs. Q–R ("Pl.'s Opp. Br.").]

## II.    PROCEDURAL HISTORY

On May 1, 2024, Plaintiff filed suit in New Jersey state court, asserting sexual harassment, retaliation, and aiding and abetting claims under the New Jersey Law Against Discrimination ("NJLAD").    [Docket No. 1-1, ¶¶ 64–70 ("Compl.").]    Apart from compensatory damages, Plaintiff is seeking punitive damages and equitable relief.  [*Id.* ¶¶ 65, 68, 70–79.]  After being served on May 10, 2024, Defendants timely removed the case to this Court for diversity jurisdiction.  [Docket No. 1 ¶ 3 ("Notice of Removal").]  Defendants now move for summary judgment, which is fully briefed and ready for review.  [Defs.' Br.; Pl.'s Opp. Br.; 46 ("Defs.' Reply Br.").]

## III.    JURISDICTION

The Court exercises subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000. [Notice of Removal ¶¶ 7–20.]  Plaintiff is a New Jersey resident, Greger of Delaware, and Costco of Washington.  [*Id.* ¶¶ 8–10.]  Implicit in the parties' briefing is that New Jersey law applies, *see* [Defs.' Br.; Pl.'s Opp. Br.; Defs.' Reply Br.], which accords with the time-worn understanding that "a federal court must apply the substantive laws of its forum state in diversity actions."  *Lafferty v. St. Riel*, 495 F.3d 72, 76 (3d. Cir. 2007) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).

## IV.    LEGAL STANDARD

Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be *no* genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

When deciding the existence of a genuine issue of material fact, a court's role is not to weigh the evidence: all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party." *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983). Nevertheless, "the mere existence of a scintilla of evidence," without more, will not give rise to a genuine issue for trial. *Anderson*, 477 U.S. at 252. In the face of such evidence, summary judgment is still appropriate "[w]here the record ... could not lead a rational trier of fact to find for the nonmoving party...." *Matsushita Elec. Indus.*, 475 U.S. at 586–87. "Summary judgment motions thus require judges to 'assess how one-sided evidence is, or what a "fair-minded" jury could "reasonably" decide.'" *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (quoting *Anderson*, 477 U.S. at 265).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting FED. R. CIV. P. 56(c)). If the moving party makes this showing, the burden shifts to the nonmovant who "must set forth specific facts showing that there is a

genuine issue for trial." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288–89 (3d Cir. 2018) (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

## V.    DISCUSSION

Plaintiff brings claims of sexual harassment, retaliation, and aiding and abetting under the NJLAD.  [Compl. ¶¶ 64–70.]  Discrimination and retaliation claims under the NJLAD are analyzed under the burden shifting framework initially set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 841 (3d Cir. 2016).  The familiar *McDonnell Douglas* framework requires that Plaintiff first establish a *prima facie* case of discrimination or retaliation.  If Plaintiff establishes a *prima facie* case, the burden then shifts to Defendants to articulate a legitimate, nonretaliatory or nondiscriminatory reason for their actions. If Defendants articulate such a reason, the burden then shifts back to Plaintiff to establish that the proffered nonretaliatory or nondiscriminatory explanation is merely a pretext for the discrimination or retaliation.

At the summary judgment stage, Plaintiff may meet this burden by "point[ing] to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).  In other words, Plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] nondiscriminatory reasons.'" *Id.* (quoting *Fuentes*, 32 F.3d at 765).

### A. Sexual Harassment

Plaintiff accuses Peralta, a heterosexual woman married to a man for fifteen years, of sexually desiring her and discriminating against her for rebuffing her advances, resulting in a hostile work environment. [Compl. ¶¶ 64–66; Pl.'s Opp. Br. 4–12.] In *Lehmann v. Toys 'R' Us, Inc.*, 626 A.2d 445 (N.J. 1993), the Supreme Court of New Jersey "recognized sexual harassment in the workplace as a form of discrimination that is prohibited by the LAD." *Aguas v. State*, 107 A.3d 1250, 1259 (N.J. 2015); *see also Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 213 (3d Cir. 2017) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65–66 (1986)). "To prove this claim, a plaintiff must show that the harassment '(1) would not have occurred but for the employee's gender; and it was (2) severe or pervasive enough to make a (3) reasonable woman believe that (4) the conditions of employment are altered and the working environment is hostile or abusive.'" *Aguas*, 107 A.3d at 1259 (quoting *Lehmann*, 626 A.2d at 453); *see also Griffin v. City of E. Orange*, 139 A.3d 16, 24 (N.J. 2016).

"In sex discrimination hostile work environment claims where the alleged harasser and the victim of the harassment are of the same sex, as is the case here, … the Third Circuit has found that there are at least three" different factual scenarios, if proven, that "may establish that the harassment was because of the plaintiff's sex: 1) where there is evidence that the harasser sexually desires the victim; 2) where there is no sexual attraction but where the harasser displays hostility to the presence of a particular sex in the workplace; or (3) where the harasser's conduct is motivated by a belief that the victim does not conform to the stereotypes of his or her gender." *Belfort v. Morgan Props., LLC*, No. 16–5207, 2018 WL 3201787, at *7 (D.N.J. June 29, 2018) (citing *Bibby v. Phila. Coca Cola Bottling Co.*, 260 F.3d 257, 262–63 (3d Cir. 2001)). "[W]hatever evidentiary route a plaintiff takes, he or she must

13

'always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted' discrimination because of gender" or sex. *Betz v. Temple Health Sys.*, 659 F. App'x 137, 143 (3d Cir. 2016) (quoting *Bibby*, 260 F.3d at 264).

Defendants argue that no element of this *prima facie* claim is satisfied. [Defs.' Br. 4.] Construing the record in the light most favorable to Plaintiff, however, *see Freeman v. Lincalis*, 158 F.4th 166, 175 n.29 (3d Cir. 2025), the Court finds there is a genuine dispute of fact as to whether Plaintiff suffered a hostile work environment by way of Peralta's sexual desire.[4] So while summary judgment must be denied, Plaintiff's evidence is remarkably thin and the result of this case will certainly depend upon the jury's credibility finding.[5]

---

[4] The Court does not construe Plaintiff's briefing as advocating for *Bibby*'s second or third avenue, and the cited record is devoid of any supporting evidence thereto, in any event. *See* [Pl.'s Opp. Br. 4–6.]

[5] Mark Twain apocryphally quipped once, "If you tell the truth, you don't have to remember anything." In this vein, Plaintiff is reminded of her obligation to present this Court "with a forthright and accurate account of the facts." *OTG New York, Inc. v. OTTOGI Am., Inc.*, No. 24-07209, 2025 WL 2671460, at *2 (D.N.J. Sept. 18, 2025). "At [its] core," Federal Rule of Civil Procedure 11 "expect[s] that litigants will promote the fair administration of justice" and respect their "duty of candor to the Court." *Id.*; *see also Sofaly v. Portfolio Recovery Assocs., LLC*, 155 F.4th 289, 293 (3d Cir. 2025). And "[c]andor means more than just not lying." *Wharton v. Superintendent Graterford SCI*, 95 F.4th 140, 148 (3d Cir. 2024). It means steering clear of a "mosaic of half-truths, inconsistencies, mischaracterizations, exaggerations, omissions, evasions, and failures to correct known misimpressions." *Six v. Generations Fed. Credit Union*, 891 F.3d 508, 511 (4th Cir. 2018). In this regard, the parties are on notice that, as part of a Rule 11 good-faith review, this Court will likely present "special verdict interrogatories" to the jury so as "to determine the factual issues essential to the judgment." *McNally v. Nationwide Ins. Co.*, 815 F.2d 254, 266 (3d Cir. 1987); *see also Sprinkle v. AMZ Mfg. Corp.*, 567 F. App'x 163, 164 (3d Cir. 2014) (citation and quotation mark omitted) ("Rule 49 of the Federal Rules of Civil Procedure grants district courts wide discretion to craft special verdict forms and interrogatories using any method that the court considers appropriate."). In so doing, this Court intends to exercise its "long recognized" inherent power "to protect the integrity of th[is] proceeding[]." *Sofaly*, 155 F.4th at 295.

14

Plaintiff testified that in August 2022, Peralta asked her, "[W]hy did you break up, or why are you – are you single, or why, and just certain questions of that nature." [Defs.' SOMF ¶ 83.] Plaintiff asked Peralta to stop, which she did, but then "wanted to try to tell [her] something about her and her husband." [*Id.* ¶¶ 86, 89; Defs.' Br., Ex. B, at 118:6.] Plaintiff responded, "Don't do that neither [sic]," to which Peralta stopped again. [Defs.' SOMF ¶ 89; Defs.' Br., Ex. B, at 118:7–8.] Plaintiff, who "didn't like that," reported Peralta for "prying a little bit into my personal life." [Defs.' Br., Ex. B, at 112:12–14; Defs.' SOMF ¶ 82.]

Once turned down, Peralta, according to Plaintiff's testimony, started "singl[ing] out" and "harassing" Plaintiff and accusing her of insubordination and pulling her into her office "at least like twice a week." [Defs.' SOMF ¶ 62; Defs.' Br., Ex. B, at 123:23–25, 145:10–13.] Even after this treatment appeared over, once reported, Plaintiff testified that Peralta again probed into her romantic history in May 2023, asking, "Well, why did you all break up." [Defs.' SOMF ¶¶ 62, 88, 90; Defs.' Br., Ex. B, at 112:22–13:2.] True, Peralta stopped there too, but Plaintiff thereafter met with Peralta, Greger, and Forsyth about this issue that same month. [Defs.' SOMF ¶ 88; Pl.'s Opp. SOMF ¶ 20.] And during the meeting, Plaintiff repeated that Peralta was "singling her out," at which point "Greger and Forsythe … requested th[at] Plaintiff step out so they could have a conversation with Peralta." [Pl.'s Opp. SOMF ¶¶ 21–22.] It was at this point that Plaintiff posits that she learned of Peralta's "crush" and that she behaved as such "because Plaintiff did not respond to her in a manner that Peralta wanted her to." [*Id.* ¶ 23; Defs.' SOMF ¶ 75.]

Defendants' evidence and interpretations thereof are to the contrary. But, under the "totality of the circumstances, including the frequency of the discriminatory conduct; its

15

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance,'" *Belfort*, 2018 WL 3201787, at *7 n.7 (quoting *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 168 (3d Cir. 2013)), there are fact questions as to whether the "conduct was 'severe or pervasive' enough to make a reasonable woman believe that the conditions of employment are altered and her working environment is hostile," *see Wells v. AAA N. Jersey*, No. A-2885-18T2, 2020 WL 3815682, at *6 (N.J. Super. Ct. App. Div. July 8, 2020) (quoting *Lehmann*, 626 A.2d at 454) ("As to elements two through four we review them interdependently because "[o]ne cannot inquire whether the alleged conduct was 'severe or pervasive' without knowing how severe or pervasive it must be.").

Plaintiff barely does so by her own deposition testimony, without much, if any, corroboration. And, as noted, the resolution of these factual disagreements will almost exclusively rely upon the credibility of Plaintiff, Greger, Forsyth, and Peralta. On summary judgment this Court is tasked with deciding "what a fair-minded jury *could* reasonably decide." *Williams*, 891 F.2d at 460 (emphasis added). Here, what one reasonable jury could, in Defendants' view, conclude as a "mere personality conflict" beset with "miscommunications and disagreements," [Defs. Br. 9], another may determine is a "crush"-driven supervisor reactively "singling out" and "harassing" an underling for the reasons above. Although Peralta "never touched Plaintiff inappropriately," "tried to hug or kiss" her, "asked … to socialize outside of work," or "communicated with [her] outside of work, [Defs.' SOMF ¶¶ 78, 81], "the harassing conduct need not be sexual in nature; rather, its defining characteristic is that the harassment occurs because of the victim's sex," *Lehmann*, 626 A.2d at 153. There is no "bright line, obviously," between "a merely unpleasant working

environment on the one hand and a hostile or deeply repugnant one on the other." *Wells*, 2020 WL 3815682, at *6 (quoting *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430–31 (7th Cir. 1995)); *see also id.* at *7 (citing *Cutler v. Dorn*, 955 A.2d 917, 927 (N.J. 2008)) ("[The Supreme Court of New Jersey has held, in hostile work environment cases, whether rude and obnoxious behavior is severe or pervasive enough to be actionable, is a jury question, precluding summary judgment."). At this time, the Court finds the jury the more appropriate body to draw that line.

Even if Plaintiff could establish a sexual harassment-hostile work environment claim, Defendants posit they are nonetheless shielded from *respondeat superior* liability, enumerated sometimes as the claim's fifth element, *see, e.g.*, *Belfort*, 2018 WL 3201787, at *7, because of the *Faragher–Ellerth* defense, [Defs.' Br. 11–13]. Preliminarily, "[t]h[is] affirmative defense applies only when the plaintiff employee has not suffered a tangible employment action." *Robinson v. N. Am. Composites*, No. 15-8702, 2017 WL 2443056, at *11 (D.N.J. June 6, 2017) (citing *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 328 (3d Cir. 2015)). "In such cases, the *Faragher–Ellerth* defense protects an employer from liability where 'the employer "exercised reasonable care to avoid harassment and to eliminate it when it might occur" and the complaining employee "failed to act with like reasonable care to take advantage of the employer's safeguards and otherwise to prevent harm that could have been avoided.'" *Id.* (quoting *Jones*, 796 F.3d at 328 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 805 (1998))).

The Court likewise finds disputed facts in the record precluding summary judgment based on the *Faragher–Ellerth* defense. First, although Peralta herself had "no involvement in the decision to suspend or terminate Plaintiff's employment," this, in the Court's view, is not

17

tantamount to it being factually undisputed that "*Defendants* did not take any adverse action against Plaintiff as a result of Peralta's alleged behavior." [Defs.' Br. 11–12 (emphasis added).] Costco unquestionably suspended and then terminated Plaintiff, [Defs.' SOMF ¶ 119]; *see Jones*, 796 F.3d at 328 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)) ("The Supreme Court has defined a 'tangible employment action' as 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"), and Defendants leave completely unbriefed the legal issue of whether, or to what degree, the harassing supervisor herself must be "involv[ed]" in the tangible employment action, *see* [Defs.' Br. 11–12].

Secondly, the record, viewed in Plaintiff's favor, contains clear factual disputes as to whether the parties respectively honored or took advantage of the Open Door Policy in accordance with *Faragher–Ellerth*'s two prongs. In light of Plaintiff's repeated discussions with Costco management about Peralta's *continuing* harassment, including Plaintiff trying, yet failing, to arrange a meeting therewith, Defendants' entitlement to the *Faragher–Ellerth* defense is fit for the jury, not summary judgment. *See supra*, at 5–7. Consequently, Plaintiff may proceed with her NJLAD sexual-harassment hostile work environment claim.

## B. Retaliation

The NJLAD makes it a violation for "any person to take reprisals against any person because that person has opposed any practices or acts forbidden under ... [the NJLAD] or because that person has filed a complaint, testified or assisted in any proceeding under ... [the NJLAD] or to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of that person having aided or encouraged any other person in

18

the exercise or enjoyment of, any right granted or protected by" the NJLAD. N.J. STAT. ANN. § 10:5–12(d). In order to make a *prima facie* case of retaliation, Plaintiff must show: (1) that she engaged in protected employee activity; (2) that there was an adverse action by Defendants either after or contemporaneous with her protected activity; and (3) that there is a causal connection between her protected activity and Defendants' adverse action. *See Marra v. Phila. Housing Auth.*, 497 F.3d 286, 300 (3d Cir. 2007). Defendants challenge the first and third *prima facie* elements. [Defs. Br. 13–19.]

First, the Court disagrees that Plaintiff has not shown that she engaged in a protected activity. [*Id.* at 14–15.] *Au fond*, Defendants argue that Plaintiff only made generalized, generic complaints of harassment, such as those "about workplace disagreements," not ones specifically of sexual harassment. *See* [*id.*] Viewing the record in her favor, Plaintiff's complaints were not the "sort of 'general complaint of unfair treatment' that we have held 'does not translate into a charge of illegal ... discrimination.'" *Ogunbayo v. Hertz Corp.*, 542 F. App'x 105, 107 (3d Cir. 2013) (per curiam) (quoting *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701–02 (3d Cir. 1995)). Plaintiff repeatedly complained to Costco management about Peralta "prying a little bit into [her] personal life," which she "didn't like," and "complained … that she felt singled out by Peralta and that Peralta was 'harassing her.'" [Defs.' Br., Ex. B, at 112:12–14; Defs.' SOMF ¶¶ 62, 82.] In keeping with the NJLAD's spirited purpose, "when an employee voices a complaint about behavior or activities in the workplace that he or she thinks are discriminatory, we do not demand that he or she accurately understand the nuances of the LAD." *Battaglia v. United Parcel Serv., Inc.*, 70 A.3d 602, 620 (N.J. 2013). Where, as here, there is "a good faith belief that the conduct complained of violate[d] the [NJ]LAD," a *prima facie* showing is made. *Id.* at 618.

19

As to causation, Defendants argue twofold: the June 24, 2023, incident is an independent, intervening event disrupting causality and that Rubanenko, "whose approval was required by Costco's policy before Plaintiff could be terminated, had no knowledge of any complaint Plaintiff made about Peralta." [Defs.' Br. 16–17.]  Defendant's first argument touches upon Plaintiff's claim of pretext, for which the Court finds, if scarcely, a genuine dispute of material fact for the jury.

It is indeed the case that with respect to the June 24, 2023, incident, Plaintiff "concedes this was not an appropriate way to interact with a member," "knows she should have walked away," and "takes full responsibility for" it.  [Defs.' SOMF ¶¶ 101–03; Pl.'s Opp. SOMF ¶¶ 101–02.]  What Plaintiff disagrees with though is that Defendants fired her for this reason, *i.e.*, it was pretextual.  *See* [Pls.' Opp. Br. 17–19.]  She argues as follows: Defendants changed the stated reason for her termination from "Excessive Policy Violations" to "Serious Misconduct" and other Costco employees have engaged in similar "Serious Misconduct," but have not been terminated.  *See* [*id.*]  Defendants retort that the change was simply "an administrative error" and, anyway, a "red herring" because "Plaintiff's employment could have been terminated under either section" of the Employment Agreement.  [Defs.' Br. 18–19.]  They add that "the record contains a number of examples where the Warehouse took serious disciplinary action, including termination, against employees who acted inappropriately or aggressively towards a member."  [*Id.* at 19.]

Plaintiff's original termination form listed "Excessive Policy Violations" as the stated reason for her termination.  [Defs.' SOMF ¶ 120; Pl.'s Opp. SOMF ¶ 120.]  Several weeks later Plaintiff emailed Ewing to "get a little more clarity on [her] termination," mentioning that she spoke to Conklin and Pereira "about … [Peralta's]" harassment on June 28, 2023,

and that "the[y] d[id] nothing about it." [Defs.' SOMF ¶ 122; Defs.' Br., Ex. Z.] To Plaintiff, it was "very odd" that Costco management "[brought] up" the June 24, 2023, incident when she complained about Peralta on June 28, 2023. [Defs.' SOMF ¶¶ 124, 12.] Shue and Ewing then conducted a follow-up investigation, concluding that "Plaintiff's employment was "appropriately terminated because of the June 24, 2023[,] member incident" and "explained that the reason for her termination should have been labeled 'Serious Misconduct' as opposed to 'Excessive Policy Violations.'" [Defs.' SOMF ¶¶ 127–28, 131–33, 139–40, 143; Defs.' Br., Ex. CC, at 2.] Shue and Ewing thereafter reported the outcome of their investigation to Plaintiff on September 28, 2023, and provided her a second termination notice. [Defs.' SOMF ¶¶ 139, 144.]

Again, "a fair-minded jury *could* reasonably decide" that this was an innocuous "administrative error." *Williams*, 891 F.2d at 460 (emphasis added). But, as this Court is confined to conclude, a reasonable jury could also find that Defendants changed their stated termination reason *ex post facto* to more firmly support their position in light of Plaintiff's complaints about Peralta's conduct. Adopting Defendants' position, in light of the record evidence, would be contrary to Rule 56 precepts. The Court therefore finds that Plaintiff, albeit scarcely, has "cast … sufficient doubt upon … the legitimate reasons proffered by … [D]efendant[s] so that a factfinder could reasonably conclude that each reason was a fabrication ... or ... allow[] the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Wishkin v. Potter*, 476 F.3d 180,185 (3d Cir. 2007) (quoting *Fuentes*, 32 F.3d at 762).

Moreover, Defendants second argument—that Plaintiff could have been terminated under either stated reason—rests, after close review, on clear factual disputes regarding

Plaintiff's comparator, or similarly-situated employee, evidence. *See* [Defs.' Br. 18–19, Pl.'s Opp. Br. 17–19; Defs.' Reply Br. 11–13.] And, to the extent it does not, this argument, upon inspection, does not necessarily dispel the possibility that Defendants still changed the termination classification to bolster their unlawful pretext.

The Court sees no force in Defendant's second argument. While the parties agree that Rubanenko "was not aware of any complaints or allegations Plaintiff may have raised concerning sexual harassment," it is equally undisputed that Rubanenko acted upon *Greger's* recommendation of termination. [Defs.' SOMF ¶ 116.] As discussed above, there exists a factual dispute over Greger's knowledge of Plaintiff's complaints about Peralta's conduct. *See supra*, at 5–7. For these reasons, the Court finds summary judgment as to Plaintiff's NJLAD retaliation claim inappropriate at this time.

### C. Aiding and Abetting

Plaintiff alleges a claim of aiding and abetting a NJLAD violation against Costco and Greger. [Compl. ¶¶ 69–70.] Initially, Defendants correctly observe that Plaintiff's aiding-and-abetting claim against Costco is improper because, "as the employer, [Costco] is the primary defendant under the NJLAD. It did not aid and abet its own alleged discriminatory conduct." *Belfort*, 2018 WL 3201787, at *10. Plaintiff apparently recognizes this and instead singularly focuses on Greger. [Pl.'s Opp. Br. 19–21.] The claim against Costco is accordingly dismissed.

As for Greger, Plaintiff alleges that he aided and abetted Costco in her sexual harassment. [Compl. ¶ 70.] "There is no direct *primary* individual liability under the NJLAD." *Gibbs v. Massey*, No. 07-3604, 2009 WL 838138, at *4 (D.N.J. Mar. 26, 2009) (emphasis in original) (citing *Cicchetti v. Morris Cty. Sheriff's Off.*, 947 A.2d 626, 645 (N.J.

22

2008)).   The NJLAD instead imposes secondary liability for "any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so." *Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 126 (3d. Cir. 1999) (citing N.J. STAT. ANN. 10:5–12(e)); *see also id.* ("[I]ndividuals may be liable secondarily under an aiding and abetting theory of liability.").

Aiding and abetting liability under the NJLAD can be active or passive. *See Lopez–Arenas v. Zisa*, No. 10–2668, 2012 WL 933251, at *8 (D.N.J. Mar.19, 2012). "To establish the former—the active—form of aiding and abetting liability, a plaintiff must show that '(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation.'" *Id.* at *10 (quoting *Tarr v. Ciasulli*, A.2d 921, 929 (N.J. 2004)); *see also Lauto v. Dover Pub. Sch. Dist.*, No. 21-18246, 2022 WL 3646573, at *6 (D.N.J. Aug. 24, 2022) (quoting *Cicchetti*, A.2d at 645). "To establish the latter—the passive—form of aiding and abetting liability, a plaintiff mush show that the supervisor holds a duty to act against harassment and yet remains deliberately indifferent to its existence." *Zisa*, 2012 WL 933251, at *10 (citing *Hurley*, 174 F.3d at 126).

Plaintiff apparently proceeds under both theories, arguing that Greger was aware of Peralta's sexual harassment and, as General Manager, failed to conduct an investigation into it.[6] [Pl.'s Opp. Br. 20.]   Defendants confusingly argue that "there is no *claim* Greger actively

---

[6] In the Court's view, the critical defect in Plaintiff's theory is that none of the material facts cited by her in support affirmatively state that Greger failed to conduct an investigation after learning about the purported harassment. *See* [Pl.'s SOMF ¶¶ 11–15, 19–25.] Rather, Plaintiff curiously states that Greger "would have conducted an investigation into a report of harassment" or that "he was expected to have conducted an investigation if he was aware."

23

aided and abetted any hostile work environment." [Defs.' Br. 20 (emphasis added).]  But this does not direct the Court to any portion of the record they "believe[] demonstrate[s] the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  To the extent Defendants are making a Rule 12(b)(6) attack, Plaintiff clearly asserts an aiding and abetting claim against Greger, *see* [Compl. ¶ 70], and they do not otherwise provide the Court with any case law requiring Plaintiff to have explicitly alleged a theory of said liability, *see* [Defs.' Br. 20].

As for the passive theory, Defendants' argument that "Plaintiff never complained to Greger about sexual harassment," is factually disputed, when the record is construed in Plaintiff's favor.  *See* [Pl.'s SOMF ¶¶ 19, 24; Defs.' Opp. SOMF ¶ 19; Pl.'s Opp. SOMF ¶¶ 20–23; Defs.' SOMF ¶ 75.]  And Plaintiff's apparent concession "that *any* time she complained to *Greger* about Peralta, she left their meeting feeling the issue was resolved," [Defs.' Br. 20 (emphasis added)], contradicts Defendants' vague statement of material fact that her meetings with *unnamed* management "*typically* ended amicably."  [Defs.' SOMF ¶¶ 70–71 (emphasis added)].  Apart from this, the cited-to record pertains to *one* meeting, not the series of meetings Plaintiff disputedly had with Greger about Peralta's ongoing harassment during the period at issue.  *See* [Defs.' SOMF ¶ 71 (citing Defs.' Br., Ex. B, at 124:20–125:12).]  In light of the above, the Court must find that Defendants have not carried their Rule 56 burden to dismiss Plaintiff's aiding-and-abetting claim against Greger.[7]

---

[*Id.* ¶¶ 14–15.]  It would arguably be unreasonable for the Court to infer such a factual finding, but Defendants do not set forth this contention in their briefing, *see* [Defs.' Br. 20–21; Defs.' Reply Br. 13–14], and appear to concede, at least partially, that Greger indeed conducted some sort of an investigation, *see* [Defs.' Opp. SOMF ¶ 16].

[7] For this reason, the Court will not address Plaintiff's alternative theory of secondary liability owing to reprisal.  [Pl.'s Opp. Br. 20–21.]

### D. Equitable Relief

Count Four of the Complaint purports to bring a cause of action for "equitable remedies." [Compl. ¶¶ 71–79.] As Defendants point out, *see* [Defs.' Br. 21], and which Plaintiff apparently concedes by her silence, *see* [Pl.'s Opp. Br.], "equitable relief is a remedy and not an independent cause of action," *Henson v. Daimler Truck N. Am. LLC*, No. 22-6479, 2023 WL 3072532, at *8 (D.N.J. Apr. 25, 2023) (citing *ASAH v. N.J. Dep't of Educ.*, 330 F. Supp. 3d 975, 1019 n.25 (D.N.J. 2018) ("[C]ourts within the Third Circuit routinely dismiss stand-alone counts for declaratory and injunctive relief, since such claims are requests for remedies, and not independent causes of action.")). Because Count Four "fails to state a cognizable legal claim," the Court "will dismiss it." *Id.*

### E. Punitive Damages

Defendants finally ask this Court to dismiss Plaintiff's punitive damages request for two reasons: there is no predicate violation of the NJLAD that survives summary judgment and Plaintiff otherwise offers no record evidence of especially egregious conduct by Costco's upper management. [Defs.' Br. 21–23.] Because Plaintiff's sexual-harassment hostile work environment and retaliation claims survive summary judgment, this first argument fails. And, under these circumstances, so does the second.

"Two requirements must be satisfied to award punitive damages under the NJLAD: (1) upper management's actual participation in, or willful indifference to, the wrongful conduct; and (2) evidence that the wrongful conduct is especially egregious." *Boles v. Wal-Mart Stores, Inc.*, 650 F. App'x 125, 129 (3d Cir. 2016) (citing *Cavuoti v. N.J. Transit Corp.*, 735 A.2d 548, 551 (N.J. 1999)). Disputed here is whether Plaintiff has set forth record evidence

sufficiently demonstrating that Greger's wrongful conduct was especially egregious.[8]  This requires "a higher level of culpability than mere negligence," *Lehmann*, 626 A.2d at 465, such as "wanton[] reckless[ness]" or "malicious[ness]" amounting to "an intentional wrongdoing in the sense of an 'evil-minded act,'" *Rendine v. Pantzer*, 661 A.2d 292, 314 (N.J. 1995) (quoting *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 477 A.2d 1224, 1230 (N.J. 1984)).  But, because Plaintiff has set forth, if barely, viable predicate violations[9] and whether Greger's conduct "reached the appropriate level of recklessness or wilfulness is generally a question for the jury," the Court must deny summary judgment on Plaintiff's request for punitive damages. *Santiago v. City of Vineland*, 107 F. Supp. 2d 512, 570 (D.N.J. 2000); *see also Brown-Marshall v. Roche Diagnostics Corp.*, No. 10-5984, 2013 WL 3793622, at *7 (D.N.J. July 19, 2013) (denying summary judgment on NJLAD punitive damages claim "[b]ecause the issue of punitive damages is a fact-sensitive question for a jury, [thus] ruling on this issue at the summary judgment stage would be premature.") (collecting cases).

When viewed in the light most favorable to Plaintiff, *Qin v. Vertex, Inc.*, 100 F.4th 458, 469 (3d Cir. 2024), this Court cannot completely rule out the possibility that a reasonable jury could find Greger's conduct especially egregious, implausible as it may seem.  This conclusion

---

[8] Defendants originally argued for dismissal, at least in part, because the parties agree that Rubanenko "was not aware of any complaints or allegations Plaintiff may have raised concerning sexual harassment."  [Defs.' SOMF ¶ 118.]   But Defendants appear to have backed off that argument after apparently conceding that Greger qualifies as upper management, as argued by Plaintiff.  *See* [Pl.'s Opp. Br. 22; Defs.' Reply Br. 14–15.]  This makes sense, especially since Rubanenko received *Greger's* recommendation to terminate Plaintiff's employment.  [Defs.' SOMF ¶¶ 115–16.]

[9] To the extent Plaintiff argues that a NJLAD punitive damages claim must proceed so long as the underlying claim survives, she is mistaken.  *See Sarkaria v. Summit Anesthesia Assocs., P.A.*, No. A-1675-19T3, 2021 WL 222742, at *6 (N.J. Super. Ct. App. Div. Jan. 22, 2021) ("Rather, case law demonstrates that a deficient claim for punitive damages may be dismissed, even where a LAD claim survives summary judgment.").

notwithstanding, the Court reiterates that Plaintiff's request for punitive damages is tethered to thinly-corroborated predicate claims that will certainly rely upon a credibility contest between herself and Defendants. Of course, this is not to rule out the possibility that Plaintiff's claim for punitive damages could be subject to a pre-jury directed verdict. *See* FED. R. CIV. P. 50.

## VI.   CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [Docket No. 41] will be **DENIED IN PART** and **GRANTED IN PART**. The Motion will be **DENIED** as to Plaintiff's claims of sexual harassment, retaliation, aiding and abetting against Greger, and punitive damages brought under the NLAD. The Motion will be **GRANTED** as to Plaintiff's NJLAD aiding-and-abetting claim against Costco, and request for equitable relief to the extent it is asserted as an independent cause of action. The Court intends to **SCHEDULE** this matter for **TRIAL** upon submission of the Final Pre-Trial Order. An accompanying Order shall issue.

**June 30, 2026**                                          **/s/ Renée Marie Bumb**
Date                                                                     Renée Marie Bumb
                                                                              Chief United States District Judge

27